UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PAUL J. MURPHY, Regional Director of the
Third Region of the National Labor Relations
Board, for and on behalf of the National
Labor Relations Board,

                                        Petitioner,

        -v-                                                        1:20-MC-11

NCRNC, LLC, *doing business as* Northeast
Center For Rehabilitation and Brain Injury,

                                        Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                    OF COUNSEL:

NATIONAL LABOR RELATIONS BOARD          ALICIA E. PENDER, ESQ.
Attorneys for Petitioner                GREGORY C. LEHMANN, ESQ.
Albany Office - Region 3
Leo W. O'Brien Federal Building, Room 342
Clinton Avenue & North Pearl Street
Albany, NY 12207

Buffalo Office - Region 3               LINDA M. LESLIE, ESQ.
Niagara Center Building, Suite 630
130 South Elmwood Avenue
Buffalo, NY 14202

HINMAN, HOWARD & KATTELL, LLP           DAWN J. LANOUETTE, ESQ.
Attorneys for Respondent
P.O. Box 5250
80 Exchange Street
700 Security Mutual Building
Binghamton, NY 13902

DAVID N. HURD
United States District Judge

**MEMORANDUM–DECISION and ORDER**

**I. INTRODUCTION**

Currently pending is petitioner Paul J. Murphy's ("petitioner" or "Murphy"), Regional Director of the Third Region of the National Labor Relations Board ("NLRB"), for and on behalf of the NLRB, petition seeking temporary injunctive relief pursuant to 29 U.S.C. § 160(j), also known as § 10(j) of the National Labor Relations Act ("NLRA"), that includes, among other things, a cease and desist order enjoining and restraining respondent NCRNC, LLC, doing business as Northeast Center For Rehabilitation and Brain Injury ("NCRNC"), from interrogating, harassing, threatening, suspending, or discharging employees regarding or due to their or their co-workers' union activities, and reinstatement of two employees pending final administrative disposition of unfair labor practices charges brought against respondent. *See* ECF No. 1 ("Pet.").  The parties have briefed the issues and the matter was taken on the basis of the submissions and without a hearing.

**II. BACKGROUND**

This case concerns ongoing disputes surrounding a union organizing campaign led by 1199 SEIU United Healthcare Workers East (the "Union") at NCRNC in Lake Katrine, New York.  NCRNC is a health care facility providing rehabilitation and long term care to individuals with traumatic brain injuries.  Most of the residents, known at the facility as "neighbors," suffer from cognitive impairments such as problems with attention and concentration, mood regulation and impulse control, processing and understanding information, and self-awareness and judgment, among other issues.

The Union has been seeking since July 2019 to organize licensed practical nurses ("LPNs"), certified nursing assistants ("CNAs"), and community support service ("CSS") workers at the facility. Petitioner alleges that respondent has engaged in a vigorous campaign, replete with unfair labor practices, to prevent the Union from gaining a foothold at NCRNC.

In connection with the foregoing, on November 20, 2019, the Union filed an unfair labor practice charge in Case 03-CA-252090 alleging that respondent violated Section 8(a)(1) and (3) of the NLRA by retaliating against LPN Cathy Todd ("Todd"), and then terminating her employment on November 19, 2019, because of her union activity; retaliating against CSS supervisor Joshua Endy ("Endy")[1], including suspending him from work indefinitely, because of his union activity; and interrogating employees regarding their union activity. Pet., Exh. A.

On December 10, 2019, the Union filed an amended unfair labor practice charge in Case 03-CA-252090 alleging that respondent violated Section 8(a)(1) and (3) of the NLRA by retaliating against Todd, by suspending, and later terminating her employment on November 19, 2019, because of her union activity; retaliating against Endy, by suspending him from work indefinitely and then terminating his employment on November 27, 2019, because of his union activity; interrogating employees regarding their union activity; threatening employees regarding and/or because of their union activity; and creating the impression of surveillance regarding employees' union activity. Pet., Exh. B.

---

[1] Despite his title, it is petitioner's position that Endy is not a supervisor within the statutory definition of the NLRA, and therefore is still entitled to the NLRA's protections. This is discussed in more detail below.

On January 7, 2020, the Union filed a charge in Case 03-CA-254186.  That charge is not before this Court as petitioner does not seek injunctive relief regarding that allegation.

The aforesaid charges were referred to petitioner as Regional Director of the Third Region of the NLRB.  On March 4, 2020, the Regional Director issued an order consolidating the above cases, setting forth a consolidated complaint, and providing notice of a hearing. The administrative hearing was scheduled to begin on April 27, 2020 and continue for consecutive days until completed.  On April 1, 2020, the Regional Director issued an order postponing the administrative hearing indefinitely due to COVID-19.

On April 13, 2020, the Regional Director filed the instant petition, which seeks a temporary injunction from the Court reinstating Todd and Endy, rescinding the suspensions issued to them, and enjoining NCRNC from engaging in further unfair labor practices. Petitioner contends that respondent has violated the NLRA by interrogating Endy and LPN Geraldine Louissaint Charles ("Louissaint Charles"); threatening Todd, Endy, and LPN Kelly Leonard ("Leonard"); creating the impression of surveillance of Leonard; and suspending and terminating Endy and Todd for their union activity.  Respondent denies these allegations and insists that the matter provides no basis for injunctive relief.

## III.  **LEGAL STANDARD**

Petitioner seeks an injunction pursuant to Section 10(j) of the NLRA, 29 U.S.C. § 160(j).  Section 10(j) provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order.  Upon the filing of any such

> petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

In this Circuit, to issue a Section 10(j) injunction, the district court must apply a two-prong test.  First, "the court must find reasonable cause to believe that unfair labor practices have been committed."  *Hoffman ex rel. N.L.R.B. v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 364–65 (2d Cir. 2001).  "[R]easonable cause to support such a conclusion is sufficient," or put differently, a "district court does not . . . make a final determination whether the conduct in question constitutes an unfair labor practice."  *Id*. at 365.  In determining whether reasonable cause exists, a district court should show "[a]ppropriate deference . . . to the judgment of the NLRB, and . . . should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed."  *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1059 (2d Cir. 1995).  "Appropriate deference" to the NLRB means that "the Regional Director's version of the facts should be sustained if within the range of rationality . . . inferences from the facts should be drawn in favor of the Region, and even on issues of law, the district court should be hospitable to the views of the General Counsel, however novel."  *Murphy v. Cayuga Med. Ctr. of Ithaca*, 715 F. App'x 108, 109 (2d Cir. 2018) (summary order) (internal quotations omitted) (citing *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1031 (2d Cir. 1980)).

Second, "the court must find that the requested relief is just and proper."  *Hoffman*, 247 F.3d at 365.  "This Circuit has made clear that courts should grant interim relief under Section 10(j) in accordance with traditional equity practice, as conditioned by the necessities of public interest which Congress has sought to protect."  *Mattina ex rel. N.L.R.B. v.*

*Kingsbridge Heights Rehab. & Care Ctr.*, 329 F. App'x 319, 321 (2d Cir. 2009) (summary order) (internal quotations omitted).  Therefore, "injunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo." *Hoffman*, 247 F.3d at 368.

When determining whether injunctive relief is necessary to prevent irreparable harm or to preserve the status quo, a standard which "preserves traditional equitable principles governing injunctive relief," courts must be mindful to apply this standard "in the context of federal labor laws."  *Murphy*, 715 F. App'x at 111 (internal quotations omitted) (citing *Hoffman,* 247 F.3d at 368; *Kreisberg v. HealthBridge Mgmt.*, LLC, 732 F.3d 131, 141 (2d Cir. 2013)).  As the Second Circuit made clear, "*Kreisberg* explained that the just and proper prong of the § 10(j) injunctive relief standard for labor disputes incorporates elements of the four-part standard for preliminary injunctions that applies in other contexts," including equitable considerations such as patient safety.  *Murphy*, 715 F. App'x at 111 (internal quotations omitted).

## IV.  DISCUSSION

At the outset, it must be reiterated that the Court's role at this juncture is merely to decide whether the standard for temporary relief under § 10(j) has been met, and, then, whether the requested relief is appropriate.  To reiterate, petitioner seeks an injunction prohibiting NCRNC from interfering with employees' organizing rights pursuant to Section 7 of the NLRA, 29 U.S.C. § 157, and discriminating among employees on the basis of their organizing activities, all pursuant to Section 8(a)(1) and (3) of the NLRA, 29 U.S.C. § 158(a)(1), (3).  The petition includes a detailed list of unfair labor practices from which the NLRB seeks to restrain NCRNC.  Petitioner further seeks two categories of personnel

actions:  court-ordered interim reinstatement of former NCRNC employees Todd and Endy and interim rescission of suspensions issued to them, all allegedly in retaliation for their organizing efforts.

### A. Factual Background[2]

### i. Union Campaign

In June 2019, the Union began an organizing campaign among LPNs, CNAs, and CSS workers at NCRNC.  Todd attended the first union meeting for employees and became a member of the Union's organizing committee, as did Endy, Louissaint Charles, and Leonard.  The union organizing campaign from its inception through the filling of the petition was driven by a devoted organizing committee made up of approximately eight employees: Todd, Endy, Louissaint Charles, Leonard, CNA Kathryn Lohman ("Lohman"), Maribel Velasquez Crespi, CNA Alex Quintanilla, and LPN Cindy Burgher.  Pet. Exh. K, English Aff. ¶ 2.

Throughout the summer and into the fall of 2019, these employees attended union meetings, participated in shift change gatherings,[3] and solicited authorization cards from coworkers.  *Id*. ¶¶ 2–5.  They also talked about the Union with coworkers, and communicated regularly with the Union's lead organizer Lige English ("English").  *Id*.

_____

[2]  The facts are taken from exhibits and the factual narrative in the petition, as well as the exhibits and affidavits provided by respondent in opposing the request for a temporary injunction.  The Court relies on this evidence because of the deference to the Regional Director's findings required in a § 10(j) proceeding. Again, the Court's role is not to resolve factual disputes, but to determine whether reasonable cause exists to support the Regional Director's position based on the evidence provided.

[3]  According to petitioner, a "shift change" is when union organizers and employees supporting the Union stand outside the facility around the time of the change of shift, in order to provide visible support for the Union and talk to employees as they either arrive at the facility for their shift, or leave the facility at the end of their shift.

In late summer and early fall, NCRNC's administration became aware of the union organizing effort.  According to petitioner, employees were first interrogated in early September 2019 when supervisor Registered Nurse Estralla Attanasio ("Attanasio") approached Louissaint Charles and asked whether she had been passing out union authorization cards.  Pet., Exh. C., Louissaint Charles Aff. ¶¶ 5, 8.  Louissaint Charles, not wanting to admit to a supervisor that she had been engaging in union activity, replied that she did not know what Attanasio was talking about.  *Id*. ¶ 10.

On October 22, 2019, the Union filed a petition to represent NCRNC's approximately 280 LPNs, CNAs, and CSS workers.  In response, NCRNC challenged the representation petition on the ground that the unit should also include the dietary employees.

On October 30, 2019, the Union withdrew the petition with the plan to continue organizing and refile in the future.  Pet., Exh. K.  On October 31, 2019, NCRNC filed a petition seeking an election in the larger unit, and on November 15, 2019, the NLRB dismissed NCRNC's petition.

### ii. <u>CSS Worker Endy</u>

Endy worked for NCRNC since September 2014, and was involved in the Union's organizing campaign since its inception.  Pet., Exh. D, Endy Aff. 1, ¶¶ 1, 16.  He handed out union authorization cards and talked to his coworkers about the Union, off duty.  *Id*. ¶ 16.

During his shift on November 11, 2019, his supervisor, CSS director Marcos DeAbreu ("DeAbreu"), called him to a meeting in the administrative suite.  *Id*.; Pet., Exh. F.  The meeting had been called by Keith Periano ("Periano") to discuss Endy's allegedly improper solicitation of union authorization cards.  Pet., Exh. F, DeAbreu Aff. ¶ 20.  Periano, a labor relations consultant, had been hired by NCRNC to assist with human resources and labor

relations matters.  Periano Aff. ¶ 1.  According to DeAbreu, the meeting included himself, Endy, Periano, and two other men.[4]

According to Endy, Periano[5] asked if he knew why he was called to the meeting to which he replied he did not.  Endy Aff. 1, ¶ 17.  Periano advised it was because of Endy's involvement with the Union; he told Endy that he used his supervisory authority to "force people to sign cards."  *Id*.  Periano was asked who else handed out cards and who signed cards.  *Id*.  Endy responded that he was not saying anything.  *Id*.  Periano also asked if Endy knew what he did was against the law and told him that because he was a supervisor it was against federal law to hand out cards.  *Id*.

Periano threatened that the Union and NCRNC were going to sue Endy and that he should be ready to go to court.  *Id*.  According to Endy, after commenting, he was told to shut up and that he was not there to talk.  *Id*.  DeAbreu advised Endy that he would be suspended indefinitely until the investigation was over; according to Endy, no one said what the investigation was about and he did not ask.  *Id*.  Endy then handed his badge to DeAbreu who walked him out of the building.  *Id*.  He contends he was never told he was terminated until he got a letter in the mail weeks later saying he was terminated as of the meeting date.  Pet., Exh. E, Endy Aff. 2, ¶ 17.

---

[4]  The record is not clear as to who the two other individuals were; according to Abreu, their names were Mike and possibly Mondo, and he did not know if they were employed by NCRNC.  Regardless, their identity does not seem relevant at this stage.

[5]  In Endy's first affidavit, he referred to the person doing the questioning as Mark or David.  In his subsequent affidavit, he indicated that he did not know the person's name because he did not introduce himself.  It is undisputed that Periano was in the meeting and "did most of the talking."  DeAbreu Aff. ¶ 21.  Thus, it can safely be assumed that Endy's statements are describing his exchange with Periano.

Respondent's version of events differs drastically after the initial exchange regarding why the meeting was called.  According to Abreu, no one threatened Endy that he would be sued, no one told him to shut up, and Endy admitted he did know of other supervisors handing out cards and named one such individual.  DeAbreu Aff. ¶¶ 21–22.  Instead, Periano told Endy it was an unfair labor practice for supervisors to be handing out cards because employees could feel coerced by him as their supervisor.  Periano Aff. ¶ 6.  According to Periano, Endy was not receptive to the conversation, and "[w]hile the conversation was on-going, he got up, threw his badge at Mr. DeAbreu and said I don't need this fucking job anyway, and walked out slamming the door so hard it broke the trash can behind the door and put a hole in the wall."  *Id*. ¶ 6–7.

DeAbreu also contends that during the meeting, Endy became aggressive; he threw his badge on the table and "said something to the effect that he did not need this fucking job".  DeAbreu Aff. ¶ 23.  According to him, Endy opened the door and slammed it on the wall, which resulted in the handle banging against the wall and damaging the wall.  *Id*.  Endy then stormed out of the conference room and down the hallway.  *Id*.  As he did so, DeAbreu advised Endy he was terminated for insubordination and property destruction.  *Id*.  He admits that he said this as Endy opened the door to go into the hallway, and he "believe[s] he heard me."  *Id*.

Endy refutes that he responded in this way.  He admits that he was annoyed during the meeting but did not express it, and did not throw anything, slam a door, or yell.  Endy Aff. 2, ¶ 12.  He contends that per NCRNC's protocol for suspended employees, he surrendered his badge, sliding it across the table to DeAbreu.  *Id*. ¶ 13.  He denies throwing the badge down and points out that it did not even slide off the table.  *Id*.  He also denies saying that he

"did not need the fucking job," and contends he does in fact need the job as he has a family to support.  *Id*. ¶ 14.  After this, he got up and opened the door; the door banged against the wall but not because he slammed it open.  *Id*. ¶ 16.  Instead, it just opened quickly.  *Id*.  He points out that most of the doors at the facility have a hydraulic spring so they open slowly but this door did not.  *Id*.  According to Endy, he did not find out he was terminated until he received a letter weeks later stating he had been discharged as of November 11, 2019.  *Id*. ¶ 17.

### iii.  <u>LPN Leonard</u>

Leonard worked for NCRNC for 14 years and was involved in the Union's organizing campaign in the summer and fall of 2019.[6]  Pet., Exh. G, Leonard Aff. ¶¶ 1–2.  She handed out union authorization cards to coworkers and attended union meetings.  *Id*. ¶ 2.

On November 12, 2019, the day after Endy's meeting, Leonard was called to a meeting with various NCRNC managers, including the director of nursing, head of housekeeping, head of maintenance, director of medical records, a human resource representative, and four consultants, including Periano.  *Id*. ¶¶ 3, 5.  Periano told Leonard that NCRNC had received four statements from housekeeping employees that she was harassing them to sign union authorization cards.  *Id*. ¶ 8.  Leonard requested to view the statements but Periano denied her request.  *Id*. ¶ 9.  The head of maintenance told Leonard that NCRNC had video from surveillance cameras of her talking to people and giving them

---

[6]  Leonard has since left NCRNC.  Resp. Mem. of Law in Opp'n, ECF No. 9–2, 9.  According to Todd, Leonard quit because of NCRNC's actions toward her in response to the Union's organizing campaign.  Pet., Exh. M, Todd Aff. 2, ¶ 5.  Leonard also told Lohman she left because she felt threatened after NCRNC included a letter with mid-December employee paychecks which mentioned the charges filed by the Union against NCRNC and specifically mentioned Leonard and a statement from her affidavit.  Lohman Aff. ¶ 17.

authorization cards.  *Id*. ¶ 12.  Leonard asked to see the statements and the video footage; Periano again refused.  *Id*. ¶ 13.

As Periano's questions continued, Leonard told him that she had been employed by NCRNC for 14 years and had never been in any trouble, and further that she had never done any union work on the clock.  *Id*. ¶¶ 18, 19.  Periano asked if she knew that the Union could not protect her and her nursing license.  *Id*. ¶ 23.  When Leonard asked why he brought that up, Periano replied that he was simply letting her know.  *Id*.

Respondent's version of events again differs.  Though largely confirming the meeting with respect to the alleged complaints about authorization cards, NCRNC Administrator Patrick Weir ("Weir") contends the meeting occurred because NCRNC received complains that Leonard was telling residents that staffing levels were unsafe.  Weir Aff. 2, ECF No. 9, ¶ 48.  According to Weir, this type of comment is verbal and mental abuse as it can make residents feel unsafe; he contends that after admitting to making the comments, Leonard was counseled that such comments were not appropriate.  *Id*. ¶ 49.  Notably, Weir was not at the meeting and respondent has not provided an affidavit from anyone with direct knowledge of what else took place during the meeting.

### iv.  **LPN Todd**

Todd worked for NCRNC for 12 years and had no disciplinary history.  Pet., Exh. H, Todd Aff. 1, ¶¶ 1, 21.  She was an open and vocal Union supporter since the campaign's inception.  *Id*. ¶¶ 4, 7.  She handed out and collected authorization cards, attended shift changes, answered questions from her coworkers, and attended Union meetings.  *Id*. ¶ 7.  Todd also spoke to many supervisors and managers about the Union and why she supported its efforts.  *Id*. ¶ 10.  Specifically, both Weir and director of nursing Carolyn Carchidi

("Carchidi") knew of Todd's involvement in the campaign, Weir Aff. 1, ¶ 4; Pet., Exh. I, Carchidi Aff. ¶ 3, though Weir later denied knowing Todd was a member of the union organizing committee, Weir Aff. 2, ¶ 13.

On November 13, 2019, Todd received a call from Weir and Carchidi.[7]  Weir and Carchidi were calling because of a complaint about Todd lodged by a CNA on her unit.[8]  Pet., Exh. J, Weir Aff. 1, ¶ 5.  Weir told Todd that NCRNC had received complaints from residents about her, and she was being suspended pending an investigation.  Todd Aff. 1, ¶ 16; Weir Aff. 1, ¶ 14.  According to Todd, Weir advised that the complaints included removing food from a patient's tray and using her cell phone during medication distribution; he did not mention any complaints from coworkers.  Todd Aff. 1, ¶ 16.  Todd denied both allegations.  *Id*.  According to Weir, he told her about the allegation of her not letting patients use the phone to call their families.  Weir Aff. 1, ¶ 11.  He contends he also told her that residents said they were aware of other resident's medical issues, specifically blood sugars.  *Id*. ¶ 12.

After receiving the complaint and prior to speaking with Todd, Weir had the director of social work interview the two residents identified in the CNA's complaint.  Notes of those interviews, dated November 12, 2019, are illegible.  Weir Aff. 2, Exh. C.  After suspending Todd, Weir directed the director of social work and her employees to interview all of the

---

[7]  Weir and Todd's statements offer conflicting information about the date of the call.  According to Todd, she received the call on November 13, 2019, a day she was scheduled to work her normal 3:00 p.m. to 11:00 p.m. shift.  Todd Aff. 1, ¶ 16.  Carchidi's notes memorializing the call and Todd's denials are dated November 13, 2019.  Weir Aff. 2, Exh. D.  By contrast, according to Weir, he received the CNA's complaint on November 10 or 11, 2019, and called Todd the next morning; he called Todd because she was off that day.  Weir Aff. 1, ¶¶ 5, 10.

[8]  The actual complaint included the following allegations about Todd:  discussing work related issues about the facility and resident's personal issues out loud; screaming about things residents do that she does not like; and refusing to allow some residents to use the phone or get extra food (favoritism).  Weir Aff. 2, Exh. B.

residents on Todd's floor, which totaled 40 people.  Weir Aff. 2, ¶ 22.  NCRNC has submitted

statements of three residents on the floor.  Weir Aff. 2, Exh. E.  One resident, in answering

the question "Have staff ever yelled or been rude to you?" responded "yes, Kathy nursing–

happened few times when asking for meds yelling at her for asking." *Id*.  Another resident,

after indicating no complaints in each question about staff treatment, wrote on the bottom of

the questionnaire "Cathy wont let me use the phone.  She's busy giving medicine or she's

busy."[9] *Id*.  The final resident statement likewise included a comment written in the margin,

in different handwriting than the rest of the questionnaire, stating "Kathy todd yells at me all

the time she's rude Treats me like shit[.]" *Id*.

Weir contends he also directed Carchidi to interview another CNA who frequently

worked with Todd, *id*. ¶ 23; Carchidi contends she spoke with the CNA who wrote the

statement but did not speak with any other staff members, Carchidi Aff. ¶ 6.  Notes from

Carchidi's interview indicate the CNA witnessed Todd tell a resident "she should not dip her

bread in her yogurt, that's what a spoon is for."  Weir Aff. 2, Exh. F.  The notes also state that

Todd "[h]as/will deny pills if they don't come out to the desk to get them." *Id*.

Though the investigation did not reveal any specific examples of misconduct by Todd,

NCRNC concluded she should be discharged.  Weir has indicated that he and Carchidi "had

a conversation and decided together that the evidence against Todd warranted termination."

Weir Aff. 1, ¶ 19.  Weir's later statement provides that he "was the decision maker for her

termination."  Weir Aff. 2, ¶ 13.  By contrast, Carchidi explained:  "I decided that based on

---

[9]  Todd has indicated that previously, there was an issue with residents wanting to make phone calls
during medication distribution, and the unit manager made a rule that it was not allowed because staff
needed to concentrate during medication distribution.  Todd Aff. 1, ¶ 17.

the investigation, Todd needed to be terminated.  Weir agreed with my conclusion."  Carchidi Aff. ¶ 7.

On November 18, 2019, Carchidi called Todd and asked her to come to NCRNC the following day.  Todd Aff. 1, ¶ 18.  On November 19, Todd reported to the facility and met with Weir and Carchidi.  According to Todd, Weir told her that their investigation had uncovered complaints from her coworkers, including a complaint about yelling in the dining room, and that she was being discharged.  *Id*. ¶ 20.  He also told her that NCRNC would be reporting her to the New York State Department of Education, which oversees LPN licensing.  *Id*. Todd contends Weir did not raise any of the resident complaints that he had talked about during the initial conversation when she was suspended.  *Id*.

According to Weir, he told Todd that residents corroborated that she had yelled, cursed, and used her cell phone on work time.  Weir Aff. 1, ¶ 20.  He disputes that he said he would report her to the New York State Department of Education; instead he contends that he "told her that allegations of the type that were leveled against her could rise to the level of being reported to the NYS Department of Education."  *Id*. ¶ 21.

Todd's notice of termination was dated and signed November 19, 2019.  Weir Aff. 2, Exh. I.

**v.  Ensuing fallout**

On November 13, 2019, at a union meeting, English learned that Endy had been suspended on November 11, Leonard had been interrogated on November 12, and Todd had been suspended that very day.  English Aff. ¶ 8.  Within a week, Todd was discharged. Later, English learned that Endy had been discharged as of November 11.  *Id*.

According to English, within weeks of the November 13, 2019 meeting, employee attendance at union meetings "declined sharply." *Id*. ¶ 9.  He also experienced a decline in people accepting and returning his calls.  *Id*. ¶ 10.  Prior to November, he was speaking to members of the organizing committee two or three times a week, and non-committee supporters on an average of once per week.  *Id*.  After mid-November, it became difficult to communicate with both organizing committee members and other employees.  *Id*. ¶ 11. When employees did answer his calls, they told him to stop calling them and that it was no longer worth their time to be involved.  *Id*.  English was told words to this effect from 10 to 12 people.  *Id*.

Out of the initial eight original organizing committee members, only two were consistently willing to communicate with English as of February 2020, one being Endy who was terminated.  *Id*. ¶ 12.  The other organizing committee members stopped answering and returning his calls.  *Id*.

Moreover, the number of employees attending shift changes declined markedly, from having seven to eight attendees to having one, two, or zero after mid-November.  *Id*. ¶ 13. As for the non-organizing committee workers, "it went from being willing to have a conversation with me to people being unwilling to stop and talk."  *Id*.  One employee, upon being introduced to English, simply fled, declaring that everyone who talks to him gets fired. *Id*.; Pet., Exh. K, Lohman Aff. ¶ 18.  According to English, prior to mid-November, about two-thirds of the people who would stop during shift change had a positive reaction.  *Id*. ¶ 14.

Louissaint Charles, an early and vocal union supporter, stopped attending union meetings and shift changes after Endy was fired, and has not been taking calls from union representatives, because NCRNC "is firing people, and I feel terrible and discouraged that

people are losing their jobs, especially right before the holidays."  Louissaint Charles Aff. ¶ 6.[10]  Louissaint Charles fears for her job and does not believe she should participate any more in the organizing effort.  *Id*. ¶ 7.  She no longer talks to coworkers about the Union and if she hears people talking about it she does not engage in the conversation.  *Id*.

After Endy and Todd were discharged, Lohman—another vocal union supporter and member of the organizing committee—also stopped actively participating in the union campaign.  *See generally* Lohman Aff.  Her involvement in the organizing campaign began in the summer of 2019, joining the organizing committee, attending shift changes, talking to coworkers about the Union, and even wearing scrubs in the Union's colors.  *Id*. ¶ 2. However, in mid-November 2019 she learned Endy was interrogated and walked out of the building and Todd had been suspended.  *Id*. ¶¶ 7–8.  She also learned that Leonard had been pulled into a meeting and interrogated.  *Id*. ¶ 12.  Soon thereafter, she learned Todd had been discharged.  *Id*. ¶ 15.  NCRNC's actions toward her coworkers, and the fear that she would be called in and interrogated made her feel physically ill.  *Id*. ¶¶ 13–14.

Lohman also noticed that people who had previously been excited about the union organizing campaign began to pull back, cut themselves off from the campaign, and stopped talking about it altogether.  *Id*. ¶ 16.

Although she was welcomed to continue, Todd stopped attending shift changes after being discharged because she felt that her presence "would be a reminder to the other workers about what could happen to them if they participated" in the organizing campaign. Todd. Aff. 2, ¶ 7.  Lohman also stopped participating in shift changes, and though she will

---

[10]  It is noted that there appears to be a typo in numbering the paragraphs of Louissaint Charles' affidavit.

still talk to employees if they come to her with questions about the Union, other organizing committee members have distanced themselves from the Union since mid-November. Lohman Aff. ¶ 20.

### B. Reasonable Cause

The Regional Director alleges violations of Sections 8(a)(1) and (3) based upon a series of conduct which is referenced above and detailed in his petition.  Pet. ¶ 7.  The NLRA provides that "[i]t shall be an unfair labor practice for an employer– (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" in section 7 of the NLRA and "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. §§ 158(a)(1) & (3).  Section 7 of the NLRA establishes that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other protected activities for their purpose of collective bargaining or other mutual aid or protection[.]"  29 U.S.C. § 157.

### i. Section 8(a)(3)

"An employer violates section 8(a)(3) by firing an employee for engaging in union activity."  *New York Univ. Med. Ctr. v. N.L.R.B.*, 156 F.3d 405, 411 (2d Cir. 1998).  Such conduct also violates section 8(a)(1).  *Torrington Extend-A-Care Employee Ass'n v. N.L.R.B.*, 17 F.3d 580, 591 (2d Cir. 1994).  In these cases, "the determinative issue is the employer's motivation."  *Id*.  In considering whether an employee's termination was due to union activity, the Second Circuit has instructed as follows:

> To establish whether reasonable cause exists that an employee's termination violated the Act, a district court applies the *Wright Line* test. *See Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 276 (1994). Under the *Wright Line* test, the NLRB "General Counsel must first present evidence that proves that protected conduct was a motivating factor in the discharge." *N.L.R.B. v. G & T Terminal Packaging Co.*, 246 F.3d 103, 116 (2d Cir. 2001). Then, "[i]f this burden of persuasion is met, the employer may avoid liability only if it demonstrates by a preponderance of the evidence 'that it would have reached the same decision absent the protected conduct.'" *Id*. (internal citation omitted). "The district court does not need to make a final determination whether the conduct in question constitutes an unfair labor practice; reasonable cause to support such a conclusion is sufficient." *Hoffman*, 247 F.3d at 365. "The Board may consider direct or circumstantial evidence that an employee's protected activities motivated the employer's action of discharging him." *G & T Terminal Packaging Co.*, 246 F.3d at 116.

*Murphy*, 715 F. App'x at 110.

Respondent contends that petitioner has not demonstrated reasonable cause. NCRNC argues that Todd and Endy's terminations were unrelated to their union activities. Instead, Todd was terminated because after an investigation, NCRNC concluded that her treatment toward residents was inappropriate. According to respondent, there is no evidence that any alleged union activity played any role in her termination. It points out that Todd was not terminated until weeks after the Union withdrew its petition, the complaint and witnesses against her were all non-supervisory employees, and "there is simply no basis to conclude Patrick Weir, who oversaw the investigation and made the final decision knew anything particular about Todd's union activity." Resp. Mem. of Law in Opp'n, 13. Additionally, respondent contends it would have made the same decision even if it knew about Todd's union activity because it had reasonable expectations for how she should treat residents and she failed to meet those standards.

With respect to Endy, respondent first argues he was a statutory supervisor and is therefore not covered by the NLRA.  In any event, NCRNC contends Endy was terminated not because he was engaging in union activity but because he behaved in an unacceptable manner including screaming profanities and causing property damage after being confronted about his union activity.  Of course, NCRNC cannot dispute that it knew about Endy's union activity, as that was the basis for calling him into a meeting, but instead contends that it would have made the same decision absent his union activity.

The problem with respondent's position is that the Court's role is not to make credibility determinations or weigh the value of the evidence supporting NCRNC's decision to terminate Todd and Endy against that supporting petitioner's position.  Instead, the Court is to defer to the NLRB's findings unless those findings are "fatally flawed."  *Silverman*, 67 F.3d at 1059.  Given the deferential standard of review at this stage, reasonable cause exists to believe that NCRNC violated the NLRA by suspending and terminating Todd and Endy for their union activity.

With respect to Todd, she engaged in protected activity and respondent had knowledge of that activity.  Specifically, Weir and Carchidi knew of Todd's involvement in the union campaign.  She was suspended two days after Endy was interrogated, suspended, and discharged; the day after respondent interrogated and threatened Leonard; and within weeks of the Union's petition being withdrawn and NCRNC's petition being filed.

NCRNC cannot show that it would have suspended and discharged Todd absent any protected activity on her part.  The investigation revealed statements from only three of the 40 patients on Todd's unit and two statements from CNAs.  The statements make general references to Todd's conduct, such as denying medication to patients or denying patients

access to the phone.  The record establishes an explanation for those allegations—respondent's policies under which staff should encourage residents to be responsible for their own medication by coming to the nurse's desk and requesting it, and patients not being allowed to use the phone during medication distribution.

Taking into account Todd's 12 years of discipline-free employment at NCRNC, the timing of her suspension and discharge, her vocal support for the Union, and respondent's inability to point to either strong evidence of misconduct on her part or comparable suspensions or discharges of other employees for similar conduct, NCRNC has not demonstrated it would have suspended and discharged Todd absent her protected activity. Accordingly, there is reasonable cause to believe NCRNC violated section 8(a)(3) when it suspended and terminated Todd.

As to Endy, he was a union supporter and respondent was aware of his union organizing efforts.  In fact, the meeting was specifically called to address his solicitation of union authorization cards and he was suspended for that very reason.  NCRNC admittedly ties his discharge to his November 11 suspension, which was within two weeks of the Union's withdrawal of its petition and respondent's filing of its own petition.

Further, NCRNC's argument that Endy is a statutory supervisor fails.  It is true that "[s]ection 8(a)(3) does not protect supervisors."  *Novelis Corp. v. Nat'l Labor Relations Bd.*, 885 F.3d 100, 107 (2d Cir. 2018) (citing *NLRB v. Meenan Oil Co., L.P.*, 139 F.3d 311, 320 (2d Cir. 1998) ("Supervisors are not protected under the NLRA and do not possess a right to bargain collectively.")).  However, there is reasonable cause to believe that Endy is an employee under the NLRA; there is reasonable cause to believe he does not meet the statutory definition of a "supervisor" as that term is defined in 29 U.S.C. § 152(11).

Under § 152(11):

> [t]he term "supervisor" means any individual having authority, in
> the interest of the employer, to hire, transfer, suspend, lay off,
> recall, promote, discharge, assign, reward, or discipline other
> employees, or responsibly to direct them, or to adjust their
> grievances, or effectively to recommend such action, if in
> connection with the foregoing the exercise of such authority is not
> of a merely routine or clerical nature, but requires the use of
> independent judgment.

To prove supervisory status, the party asserting such status must demonstrate, by a

preponderance of the evidence, that (1) the purported supervisor has the authority to engage

in one of the functions enumerated above, (2) that their exercise is not merely routine and

clerical but requires the use of independent judgment, and (3) that authority is used in the

interest of the employer. *N.L.R.B. v. Kentucky River Cmty. Care, Inc.*, 532 U.S. 706, 710–13

(2001).

Petitioner concluded that Endy lacked the independent judgment and authority

necessary to establish supervisory status under the NLRA.  Again, the Court is to defer to the

NLRB's findings unless those findings are "fatally flawed."  *Silverman*, 67 F.3d at 1059.

Endy reported to CSS director DeAbreu.  According to Endy, he was responsible for

one job per shift:  those tasks could be break person, close visual observer, increased

supervision, or front desk.  Endy Aff. 1, ¶ 2.  As he explained, there were two CSS

supervisors on each of the three shifts.  Endy Aff. 2, ¶ 3.  There was one lead supervisor and

then a backup supervisor for when the lead supervisor was off.  *Id*.  Endy worked the

overnight shift as the backup supervisor; CSS supervisor Josie Cruz ("Cruz") was the lead

supervisor.  *Id*.  DeAbreu prepared the weekly schedule to indicate what dates CSS

employees were to work, and Cruz prepared a list of what specific task/job duty each CSS

employee was to perform during his or her shift.  Endy Aff. 1, ¶ 13.  When Endy and Cruz

worked the same nights, she would perform the supervisor role and he would do whatever

assignment she gave him, just like a regular CSS worker.   Endy Aff. 2,  ¶ 4.

On the days Cruz was off, Endy would fill in and perform the supervisory role.  *Id*.  The

lead supervisor, if they were there, would handle any disciplinary issues.  *Id*. ¶ 5.  The

backup supervisors would only discipline employees when the lead supervisor was not there.

*Id*.  On the days Endy filled in for Cruz as lead supervisor, he would assign the employees

their job location for the shift based on what location the employee worked the previous shift

and what location the employee was comfortable with.  Endy Aff. 1, ¶ 13.  It took Endy less

than one minute to complete the assignment sheet and about five minutes to hand out the

assignment sheets to each employee.  *Id*.

According to Endy, he was never told that he had the authority to hire or recommend

such action and he never recommended any such action.  *Id*. ¶ 3.  He was never told that he

had the authority to transfer or recommend employees for transfer and he never authorized

or recommended any employee transfer.  *Id*. ¶ 4.  He was not told that he had the authority

to suspend or discharge employees or recommend such action and he did not suspend or

discharge any employee.  *Id*. ¶ 5.

Approximately 18 months before Endy's suspension and discharge, there was an

issue related to employees reporting to work late.  *Id*.  DeAbreu had advised Endy that if any

employees arrived late that he should write them up on a piece of paper, but never told him

what to do with the write up.  *Id*.  Since his employment began, Endy recalled two instances

that occurred wherein he wrote on a piece of paper the employee's name and what time they

reported to work, what time they were supposed to report to work, and he and the employee

both signed the paper.  *Id*.  Not knowing what to do with the write up, the then nursing supervisor advised Endy to give the employee a copy and put a copy in a folder which would be given to DeAbreu.  *Id*.  In his tenure, Endy wrote approximately three to four write ups as a CSS supervisor, for attendance and one time for a job performance issue.  Endy Aff. 2, ¶ 6.

Additionally, Endy was never told that he had the authority to layoff or recall employees or recommend a layoff or recall and he has never recommended any such action.  Endy Aff. 1, ¶ 6.  He was never told that he had the authority to promote or reward employees or recommend such action and he never recommended such action.  *Id*. ¶ 7.  He was never told he had the authority to evaluate employees or provide input in evaluating employees and he never evaluated employees or provided any input regarding any employee evaluation or recommended such action.  *Id*. ¶ 8.  He was never told he had the authority to authorize or recommend employee overtime assignments and he never authorized or recommended any employee overtime assignments.  *Id*. ¶ 9.

Similarly, Endy was never told that he had the authority to approve employee time off requests for any reason or recommend such action and he never authorized or recommended any employee requests for time off.  *Id*. ¶ 10.  He was never told that he could approve or recommend employee wage increases and he never approved or recommended any wage increase for any employee.  *Id*. ¶ 11.  He was never told he could adjust any employee complaint or grievance, or that he could recommend the adjustment of any employee complaint or grievance and he never adjusted any employee complaint or grievance or recommended any employee complaint or grievance be adjusted.  *Id*. ¶ 12.

According to Endy, he was never told that he should attend any supervisor or management meetings and he never attended any supervisor or management meetings.  *Id*.

¶ 14.[11]  He was never told that he would be held accountable for employee productivity or work performance.  *Id*. ¶ 15.  DeAbreu never told Endy that CSS employees' work was a reflection on Endy's ability as a supervisor or told him that he needed to improve as a supervisor.  Endy Aff. 2, ¶ 9.

Finally, while CSS supervisors sometimes play a role in the disciplinary process, that role is limited to acting as a conduit for information.  The parties dispute whether Endy attended management meetings, and NCRNC points to his presence on management e-mails.  But alas, the NLRB must ultimately resolve the issue.  At this point, after considering the arguments of both parties with respect to the evidence presented, there is reasonable cause to believe Endy is an employee.

Finally, NCRNC cannot show that it would have suspended and terminated Endy absent any protected activity on his part.  He was suspended specifically for engaging in protected activity—soliciting authorization cards.  Respondent's defense that Endy's behavior during the November 11, 2019 meeting was so egregious that he lost the protection of the NLRA similarly fails.  As reflected in his two affidavits, Endy's account varies substantially from respondent's, and petitioner's view that Endy's version is credible warrants deference.  Even if NCRNC's version of events were credited, Endy's alleged conduct was a reaction to respondent's improper conduct during the meeting (interrogating Endy regarding union activity) and not so serious as to cause forfeiture of the NLRA's protections.

---

[11]  The parties dispute whether Endy attended management meetings.  According to Endy, he never attended a meeting with DeAbreu that was just he and the supervisors on a shift.  Endy Aff. 2, ¶ 8.  He did attend meetings where the entire shift was present, and there were times he stopped by DeAbreu's office to ask him a question but contends he never attended any facility-wide supervisor or management meetings.  *Id*.

It is true that "even when an employee is engaged in protected activity, he or she may lose the protection of the Act by virtue of profane and insubordinate comments." *Cellco P'ship*, 349 NLRB 640, 642 (2007).  However, "not all such behavior results in a loss of protection; rather, employees are permitted some leeway for impulsive behavior when engaging in concerted activity . . . balanced against an employer's right to maintain order and respect in the workplace."  *N.L.R.B. v. Starbucks Corp.*, 679 F.3d 70, 78 (2d Cir. 2012) (internal quotations omitted).  "To determine, in some contexts, whether an employee has lost the protection of the Act, the Board considers four factors:  '(1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by an employer's unfair labor practice.'"  *Id*. (quoting *Atlantic Steel Co.*, 245 N.L.R.B. 814, 816 (1979)).

Again, even if respondent's version of the meeting were to be credited, on balance, these factors favor protecting Endy.  The first factor weighs in favor of protection as the alleged outburst took place in a private area of respondent's facility—an administrative suite/conference room.  The second factor weighs in favor of protection because the alleged outburst originated out of a discussion that was entirely about the Union.  The third factor either weighs in favor of protection or only slightly against it because the alleged outburst was brief, and although it allegedly included property damage and profanity, it did not involve threats toward anyone.  Finally, the fourth factor weighs in favor of protection because the conversation that elicited Endy's alleged outburst was solely centered on accusing him and suspending him for impermissibly handing out union authorization cards as a supervisor.  While NCRNC certainly has an entirely legitimate concern as an employer not to tolerate

employee outbursts containing obscenities or property damage, the four-factor test clearly weighs in favor of NLRA protection.

For all of these reasons, there is reasonable cause to believe NCRNC violated section 8(a)(3) when it suspended and discharged Endy.

### ii. Section 8(a)(1)

To reiterate, "[s]ection 8(a)(1) of the Act prohibits employers from interfering with or coercing employees in the exercise of their Section 7 rights." *Novelis Corp.*, 885 F.3d at 106. Respondent contends that nothing petitioner has put forth provides reasonable cause to believe that NCRNC threatened employees, interrogated employees, or surveilled employees.

The record however establishes there is reasonable cause to believe that NCRNC interrogated Endy and Louissaint Charles, threatened Todd, Endy, and Leonard, and created the impression of surveillance of Leonard within the meaning of the NLRA.  "In determining whether an employer's interrogation violates the Act, the Board examines whether under all the circumstances the questioning reasonably tends to interfere with, restrain, or coerce employees in the exercise of their Section 7 rights."  *Seton Co.*, 332 NLRB 979, 982 (2000). In this case, the interrogations of Endy and Louissaint Charles occurred against a backdrop of other unfair labor practices including threats of suspension, discharge, and other discipline, as well as the impression of surveillance, and of course the suspension and discharge of Todd and Endy.  Further, respondent's inquiries of Endy's union activities were tied to its unlawful threat and subsequent suspension and discharge over his dissemination of union authorization cards.  The inquiry was intended to obtain information based on which Endy could be disciplined.

With regard to the threats, the parties again provide conflicting versions of the events. There are a host of disputed facts and these allegations must be considered in light of the deferential standard to the NLRB.  For example, respondent argues that the meeting Leonard was called to "did not relate to [her] . . . *union* activity at all" and instead related to conduct that was potentially abuse or neglect of patients.  Resp. Mem. of Law in Opp'n, 19. But that is not the story Leonard has put forth.

Finally, creating the impression that an employee's protected concerted activities are being surveilled is a violation of the NLRA.  *Flexsteel Industries*, 311 NLRB 257 (1993). "[T]he test for determining whether an employer has created an impression of surveillance is whether the employee would reasonably assume from the statement that their union activities had been placed under surveillance."  *Id*.  "[A]n employer creates an impression of surveillance by indicating that it is closely monitoring the degree of an employee's union involvement."  *Id*.  The head of maintenance told Leonard that NCRNC had video from surveillance cameras of her talking to people and giving them authorization cards.  While NCRNC has explained that the security cameras were put in place for the safety of residents and employees, the potential for an innocent explanation for one action or another, does not preclude a finding of reasonable cause.  The same is true for legal arguments about what may constitute an unfair labor practice by NCRNC.

While there are a host of disputed facts, the deferential standard requires that the NLRB's position prevails.  The Court must show deference to the judgment of the NLRB and only refuse to grant relief if it is convinced that the NLRB's legal and factual theories are fatally flawed.  There is reasonable cause to believe that respondent has engaged in unfair labor practices.  For the benefit of the employees to whom this order will be read, that the

Court found reasonable cause for the NLRB's allegations of unfair labor practices does not mean that NCRNC committed or is committing unfair labor practices—that is a question to be decided by the NLRB after a full administrative hearing.

### C. **Just and Proper**

Finding that the first prong is satisfied as to petitioner's allegations, the only issue remaining is what relief is just and proper.  Petitioner seeks an injunction prohibiting NCRNC from:

> (a) Interrogating employees about their or their co-workers' union activities;
>
> (b) Threatening employees by stating that respondent and the Union would sue them for passing out union authorization cards;
>
> (c) Threatening employees with the revocation of their nursing licenses;
>
> (d) Creating the impression that employees' protected union activities are under surveillance;
>
> (e) Suspending employees because they engage in protected union activity; and
>
> (f) Discharging employees because they engage in protected union activity.

Pet. ¶ 1.

Petitioner also seeks affirmative relief requiring NCRNC to:

> (a) Within five (5) days of the issuance of this Order, offer Endy and Todd interim reinstatement to their former positions; or, if those positions no longer exist, to substantially equivalent positions without prejudice to their seniority or any other rights and privileges previously enjoyed, displacing, if necessary, any employee who may have been hired or reassigned to replace them;

(b) Within ten (10) days of the issuance of this Order, rescind the suspensions issued to Endy and Todd and do not rely on those suspensions when issuing any future discipline;

(c) Within five (5) days of the issuance of this Order, post copies of same at respondent's Lake Katrine, New York facility where notices to employees are customarily posted; said postings shall be maintained during the pendency of the NLRB's administrative proceedings free from all obstructions and defacements; all unit employees shall have free and unrestricted access to said postings; and

(d) Within twenty (20) days of the issuance of this Order, file with the Court, with a copy submitted to the Regional Director of Region 3 of the NLRB, a sworn affidavit from a responsible official of respondent, setting forth with specificity the manner in which respondent has complied with the terms of this decree, including how it has posted the documents required by this Order.

Pet. ¶ 2.

The main issue is whether this Court should require respondent to offer reinstatement to Todd and Endy.  Respondent urges that reinstatement is not just and proper.  NCRNC contends that petitioner has provided no support to demonstrate that Todd and Endy's terminations resulted in loss of support for the Union, and posits that the Union had already lost so much support by October 30, 2019 that it had withdrawn its petition.  Further, respondent argues that reinstatement would be a significant hardship for the facility because of patient safety and disruption of the facility during the current COVID-19 healthcare crisis.  Moreover, NCRNC asserts that reinstating Todd is likely to have a chilling effect on employees who report wrongdoing.  Finally, respondent argues that injunctive relief for the alleged section 8(a)(1) violations is inappropriate given the relatively weak case presented by petitioner and the fact that there is no basis to believe that any unlawful conduct is ongoing at NCRNC.

Despite respondent's pleas to the contrary, equitable considerations compel this Court to order the requested relief.  Injunctive relief is just and proper to prevent serious irreparable harm and to preserve the status quo.  The status quo that should be preserved "is that which was in existence before the unfair labor practice occurred."  *Kreisberg*, 732 F.3d at 142. Moreover, as petitioner correctly asserts, "[w]ithout timely interim relief, NCRNC's illegal actions will irreparably harm the national policy encouraging collective bargaining, the employees' right to choose union representation, and the Board's remedial power.  In short, NCRNC will forever benefit from its illegal conduct."  Pet. Mem. of Law in Supp., ECF No. 1–2, 17–18.

The relevant equitable considerations include elements of the four-part standard for preliminary injunctions that applies in other contexts, including patient safety.  First, petitioner has not delayed in seeking an injunction and has explained why an injunction should issue in advance of the currently adjourned-without-date NLRB hearing.  The Regional Director has put forth sufficient evidence for this Court to believe that, without an injunction, the affected parties will suffer irreparable harm.

The unlawful labor practices alleged here have caused irreparable harm to the union organizing campaign.  Reinstatement of Todd and Endy, two of the most active and open union supporters, is just and proper because their discharge risked a serious adverse impact on employee interest in unionization, which in fact materialized.  Interest in the Union dropped dramatically after respondent suspended and terminated Endy and Todd. Attendance at union meetings has dropped from approximately five to ten employees to one, two, or zero employees.  Louissaint Charles, who had been actively organizing her coworkers prior to the terminations, reports that she and others are now afraid to participate, and she no

longer attends meetings, solicits cards, or talks to coworkers about the Union because she

fears losing her job.

Union organizer English notes that, after the discharges, employee participation in the

campaign declined sharply, and the number of employees willing to communicate with him

fell significantly.  Irreparable harm also includes that to discharged workers Todd and Endy

and all individuals injured by the unfair labor practices including Todd, Endy, Louissaint

Charles, and Leonard, not just to the union.  *Dunbar v. Landis Plastics, Inc.*, 996 F. Supp.

174, 178 (N.D.N.Y. 1998) (Pooler, J.).  Under these circumstances, reinstatement is

necessary to preserve the status quo as it existed prior to respondent's alleged unfair labor

practices.

Respondent's argument that the balance of hardships tips in its favor is unpersuasive.

With regard to NCRNC's claims that reinstatement of Todd and Endy would be a significant

hardship and disruptive, in light of the considerable evidence suggesting that anti-union

animus, and not Todd nor Endy's alleged misconduct, was the motivating reason behind their

terminations, it cannot be concluded that reinstatement of these two employees would be so

disruptive as not to be just and proper.  *See, e.g.*, *Fernbach ex rel. N.L.R.B. v. Raz Dairy,*

*Inc.,* 881 F. Supp. 2d 452, 469 (S.D.N.Y. 2012) (ordering reinstatement of union supporter

who was stealing from employer and rejecting argument that doing so would be disruptive to

business); *see also Blyer ex rel. N.L.R.B. v. P & W Elec., Inc.*, 141 F. Supp. 2d 326, 330

(E.D.N.Y. 2001) (ordering reinstatement of union supporter alleged to have intentionally

created problems with the company's customers).

Respondent further contends that reinstatement will jeopardize the health and safety

of its residents given Todd and Endy's alleged misconduct, including allegations of patient

abuse by Todd and an inappropriate outburst by Endy.  The Court understands the need to ensure competent health care to residents with traumatic brain injuries residing at respondent's rehabilitation and long term care facility.  It disagrees, however, that reinstating Todd would require NCRNC to "bear the hardship of reinstating an employee who harmed its residents," or that reinstating Endy would be "a hardship because now that Respondent has seen such violent behavior, it will need to monitor Endy to ensure patients and staff are not mistreated."  Resp. Mem. of Law, 23–24.  Respondents have alleged no history of misconduct on the part of either of these employees.  Given their explanations of the incidents and the minimal investigation preceding termination, this Court does not foresee the risk to residents that respondent asserts.

Simply put, the restoration of Todd and Endy to their prior positions and an order restraining and enjoining NCRNC from engaging in any unfair labor practices during the pendency of the administrative process merely serves to maintain the status quo while that process—which, as explained by counsel, may be quite lengthy—comes to its natural conclusion.  Other traditional remedies, such as reading and posting this order, are likewise appropriate.

Lastly, the Second Circuit has previously rejected respondent's appeal to overturn the current two-part standard for § 10(j) injunctions as unfair and unworkable and instead apply the four-part tested articulated by the Supreme Court in *Winter v NRDC, Inc.*, 555 U.S. 7, 22 (2008).  *See Murphy*, 715 F. App'x at 111 ("CMC invites us to revisit our reliance on a two-part test to evaluate Section 10(j) petitions, and move instead on a four-part balancing test.  We decline to revisit our precedent.").

## V. **CONCLUSION**

Based on the petition of Paul J. Murphy, Regional Director of the Third Region of the National Labor Relations Board, the pleadings, evidence, memoranda, and the entire record in this case, there is reasonable cause to believe that respondent NCRNC has engaged in, and is engaging in, acts and conduct in violation of section 8(a)(1) and (3) of the NLRA, affecting commerce within the meaning of section 2(6) and (7) of the NLRA, and that such acts and conduct will likely be repeated or continued unless enjoined and for all of the above reasons, the requested injunctive relief is just and proper.

Therefore, it is

ORDERED that

1.  The application by petitioner for a temporary injunction pursuant to section 10(j) of the National Labor Relations Act against respondent is GRANTED in its entirety;

2.  Respondent, its officers, representatives, agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with them, are enjoined and restrained, pending the final disposition of the matters involved herein pending before the NLRB, from:

(a) Interrogating employees about their or their co-workers' union activities;

(b) Threatening employees by stating that respondent and the Union would sue them for passing out union authorization cards;

(c) Threatening employees with the revocation of their nursing licenses;

(d) Creating the impression that employees' protected union activities are under surveillance;

(e) Suspending employees because they engage in protected union activity; and

(f) Discharging employees because they engage in protected union activity.

3.  Respondent, its officers, agents, and representatives shall take the following affirmative action:

(a) Within five (5) days of the issuance of this Order, offer Josh Endy and Cathy Todd interim reinstatement to their former positions; or, if those positions no longer exist, to substantially equivalent positions without prejudice to their seniority or any other rights and privileges previously enjoyed, displacing, if necessary, any employee who may have been hired or reassigned to replace them;

(b) Within ten (10) days of the issuance of this Order, rescind the suspensions issued to Josh Endy and Cathy Todd and do not rely on those suspensions when issuing any future discipline;

(c) Within five (5) days of the issuance of this Order, post copies of this Order at its Lake Katrine, New York facility where notices to employees are customarily posted; said postings shall be maintained free from all obstructions and defacements; and agents of the NLRB shall be granted reasonable access to the Lake Katrine, New York facility to monitor compliance with this posting requirement; and

(d) Within twenty (20) days of the issuance of this Order, file with this Court, with a copy submitted to the Regional Director of the NLRB for Region 3, a sworn affidavit from a responsible official of respondent setting forth with specificity the manner in which respondent has complied with the terms of this decree, including how the documents have been posted as required by this Order.

IT IS SO ORDERED.

United States District Judge

Dated: July 27, 2020
         Utica, New York.